[No. D042696. Fourth Dist., Div. One. June 17, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS KELLOGG, Defendant and Appellant.

594

## COUNSEL

Steven J. Carroll, Public Defender, and Laura Arnold, Deputy Public Defender, for Defendant and Appellant.

Casey Gwinn, City Attorney, Susan M. Heath, Assistant City Attorney, and David M. Stotland, Deputy City Attorney, for Plaintiff and Respondent.

## OPINION

**HALLER, J.—** ██ Thomas Kellogg contends his public intoxication conviction constitutes constitutionally proscribed cruel and/or unusual punishment because his status as an involuntarily homeless, chronic alcoholic makes it impossible for him to avoid being intoxicated in public. We reject this contention. The public intoxication statute, Penal Code[1] section 647, subdivision (f), is carefully crafted to impose criminal culpability only if the publicly intoxicated person is unable to exercise care for his or her own safety or the safety of others, or is obstructing a public way. The statute does not punish the mere *condition* of being a homeless, chronic alcoholic but rather punishes *conduct* posing a public safety risk. Although criminal prosecution may not be the preferred way to address the daunting challenges faced by a person in Kellogg's position, the Legislature's policy choice to retain the misdemeanor offense of public intoxication to provide for the public welfare does not rise to the level of cruel and/or unusual punishment even as applied to a homeless, chronic alcoholic.

### FACTUAL AND PROCEDURAL BACKGROUND

*Arrest and Conviction*

The facts of this case are essentially undisputed. On January 10, 2002, Officer Heidi Hawley, a member of the Homeless Outreach Team,[2] responded to a citizen's complaint of homeless persons camping under bridges and along State Route 163. She found Kellogg sitting on the ground in some bushes on the embankment off the freeway. Kellogg appeared inebriated and was largely incoherent. He was rocking back and forth, talking to himself and gesturing. Officer Hawley arrested Kellogg for public intoxication. He had $445 in his pocket from disability income.[3]

---

[1] Subsequent statutory references are to the Penal Code.

[2] The Homeless Outreach Team consists of police officers, social services technicians, and psychiatric technicians.

[3] Although homeless, Kellogg had made arrangements to have his disability check sent to a certain address.

In February 2001, Kellogg had accepted an offer from the Homeless Outreach Team to take him to Mercy Hospital. However, on three other occasions when Officer Hawley had offered Kellogg assistance from the Homeless Outreach Team, he had refused.

After his arrest on January 10, 2002, Kellogg posted $104 cash bail and was released. Because he was homeless, he was not notified of his court date and he did not appear for his January 31 arraignment. A warrant for his arrest was issued on February 11, 2002; he was arrested again for public intoxication on February 19 and 27 and subsequently charged with three violations of section 647, subdivision (f).

After a pretrial discussion in chambers about Kellogg's physical and psychological problems, the trial court conditionally released Kellogg on his own recognizance and ordered that he be escorted to the Department of Veterans Affairs Hospital (VA) by Officer Hawley. He was not accepted for admission at the hospital and accordingly was returned to county jail.

Kellogg pleaded not guilty and filed a motion to dismiss the charges based on his constitutional right to be free of cruel and unusual punishment.

*Evidence Presented at Motion to Dismiss Hearing*

Psychologist Gregg Michel and Psychiatrist Terry Schwartz testified on behalf of Kellogg. These experts explained that Kellogg had a dual diagnosis. In addition to his severe alcohol dependence, which causes him to suffer withdrawal symptoms if he stops drinking, he suffers from dementia, long-term cognitive impairment, schizoid personality disorder, and symptoms of posttraumatic stress disorder. He has a history of seizure disorder and a closed head injury, and reported anxiety, depressive symptoms and chronic pain. He is estranged from his family. Physically, he has peripheral edema, gastritis, acute liver damage, and ulcerative colitis requiring him to wear a colostomy bag. To treat his various conditions and symptoms he has been prescribed Klonopin and Vicodin and may suffer from addiction to medication.

Dr. Michel opined that Kellogg was gravely disabled and incapable of providing for his basic needs, and that his degree of dysfunction was life-threatening. His mental deficits impeded his executive functioning (planning, making judgments) and memory. Dr. Michel described Kellogg as having "good immediate reality contact," struggling to express himself but lacking the ability to do so, and a "likeable person, who obviously was trying to cope with problems for which there weren't really any . . . adequate solutions, because . . . of [his] cognitive problems and emotional problems."

Drs. Michel and Schwartz opined that Kellogg's homelessness was not a matter of choice but a result of his gravely disabled mental condition. His chronic alcoholism and cognitive impairment made it nearly impossible for him to obtain and maintain an apartment without significant help and support. Dr. Michel stated Kellogg would not be a suitable candidate for out-patient treatment but required long-term in-patient treatment at a locked facility. Because Kellogg needed a program geared towards a person with dual conditions of substance dependence and mental disorder, he was not an appropriate candidate for a typical in-patient substance abuse program. Dr. Michel thought Kellogg would be eligible for a conservatorship because of his gravely disabled condition. However, he did not think this was a feasible solution in Kellogg's particular case as dual diagnosis magnified the complexity of a person's problems, presented difficulties in terms of the degree of long-term care required, and multiplied the need for community resources.

Dr. Schwartz questioned whether a long-term, locked residential treatment setting was a viable option as density conditions (often four patients in a room) and group participation requirements were incompatible with Kellogg's schizoid personality condition. Dr. Schwartz stated that Kellogg had been offered various forms of treatment and housing but had not made use of those resources; she posited that unless resources were offered in a different way, there would be no change in outcome. Dr. Schwartz explained that for a person with Kellogg's conditions, crowded homeless shelters can be psychologically disturbing and trigger posttraumatic stress or anxiety symptoms, causing the person to prefer to hide in a bush where minimal interactions with people would occur. Additionally, a homeless person such as Kellogg, particularly when intoxicated, might refuse offers of assistance from authorities because he has difficulty trusting people and fears his situation, although bad at present, will worsen.

In Dr. Michel's view, Kellogg's incarceration provided some limited benefit in that he obtained medication for seizures, did not have access to alcohol, received some treatment, and was more stable during incarceration than he was when homeless on the streets. However, such treatment was insufficient to be therapeutic, and medications prescribed for inmate management purposes can be highly addictive and might not be medically appropriate.

Dr. Schwartz opined that incarceration was not an effective form of treatment. Although incarceration provided a period of abstention from alcohol, it did not provide the necessary additional treatments, especially for individuals with mental disorders. Dr. Schwartz stated that being placed in certain structured environments could be counter-therapeutic for a chronic alcoholic, but acknowledged that incarceration, which resulted in short-term alcohol abstention, potentially could be beneficial.

Testifying for the prosecution, Physician James Dunford stated that at the jail facility, medical staff assess the arrestee's condition and provide treatment as needed, including vitamins for nutritional needs and medication to control alcohol withdrawal symptoms or other diseases such as hypertension, seizure disorders, and diabetes. Consistent with this protocol, on February 28, 2002, Kellogg was evaluated at intake by the jail nursing staff, who found him covered with feces and resisting efforts to assess his medical condition. On March 2, the jail medical staff delineated a treatment plan for Kellogg, which included assistance with his colostomy bag, ongoing treatment of his alcohol withdrawal, medication to address his reports of pain, evaluation of the existence of and appropriate medication for seizure disorder, and support to overcome the conditions that cause him to become disheveled and foul-smelling. On March 7 the medical staff assessed that Kellogg appeared well and in no distress and no longer had alcohol withdrawal as his primary complaint. His complaints referred to abdominal and muscular pain and needs related to his colostomy bag. Dr. Dunford opined that between March 2 and 7, Kellogg's condition had improved because his seizure medicine was restarted, his alcohol withdrawal was treated, his vital signs were stable, his colostomy bag was clean and intact, his overall cleanliness was restored, and he was interacting with people in a normal way.

*Trial Court's Ruling and Subsequent Events*

After the presentation of evidence, the trial court found that Kellogg suffers from both chronic alcohol dependence and a mental disorder and was homeless at the time of his arrests. Further, his alcohol dependence is both physical and psychological and causes him to be unable to stop drinking or to engage in rational choice-making. Finding that before his arrest Kellogg was offered assistance on at least three occasions and that his medical condition improved while in custody, the court denied the motion to dismiss the charges.

On April 2, 2002, the court found Kellogg guilty of one charge of violating section 647, subdivision (f) arising from his conduct on January 10, 2002. At sentencing on April 30, the probation officer requested that the hearing be continued for another month so Kellogg could be evaluated for a possible conservatorship.

Kellogg objected to further incarceration as violating the Eighth Amendment and opposed a conservatorship. Pointing to Dr. Michel's assessment that Kellogg was not a suitable candidate for conservatorship, defense counsel argued that the conservatorship program did not have the resources to handle a person with the combination of Kellogg's problems. Further, because of his medical complications, no recovery or board and care home felt comfortable

accepting him. Kellogg requested probation to allow him to participate in the VA's rehabilitative program. Noting that the "combination of ailments that [Kellogg] suffers from presents insurmountable problems" in finding appropriate placement, defense counsel stated that if necessary, she would arrange a hotel room and transportation to the VA for him. The prosecution agreed with the defense suggestion that a concerted effort be made to place Kellogg in the VA program.

After expressing the difficult "Hobson's choice" whereby there were no clear prospects presented to effectively assist Kellogg, the court sentenced him to 180 days in jail, with execution of sentence suspended for three years on the condition that he complete an alcohol treatment program and return to court on June 4, 2002, for a progress review.

After his release from jail, defense counsel made extensive, but unsuccessful, efforts to place Kellogg in an appropriate program and to find a permanent residence for him. On May 25 and 28, 2002, he was again arrested for public intoxication. After he failed to appear at his June 4 review hearing, his probation was summarily revoked. Kellogg was rearrested on June 12. After a probation revocation hearing, Kellogg's probation was formally revoked and he was ordered to serve the 180-day jail sentence. The court authorized that his sentence be served in a residential rehabilitation program. However, no such program was found. According to defense counsel, the VA concluded Kellogg could not benefit from its residential treatment program due to his cognitive defects. Further, his use of prescribed, addictive narcotics precluded placement in other residential treatment programs, and his iliostomy precluded placement in board and care facilities.

On July 11, 2003, the appellate division of the superior court affirmed the trial court's denial of Kellogg's motion to dismiss on Eighth Amendment grounds. We granted Kellogg's request to have the matter transferred to this court for review.

## DISCUSSION

Section 647, subdivision (f) (section 647(f)) defines the misdemeanor offense of disorderly conduct by public intoxication as occurring when a person "is found in any public place under the influence of intoxicating liquor . . . in such a condition that he or she is unable to exercise care for his or her own safety or the safety of others, or by reason of his or her being under the influence of intoxicating liquor . . . interferes with or obstructs or prevents the free use of any street, sidewalk, or other public way." Kellogg argues that this statute, as applied to him, constitutes cruel and/or unusual punishment prohibited by the Eighth Amendment to the federal Constitution and article 1,

section 17 of the California Constitution.[4] He asserts that his chronic alcoholism and mental condition have rendered him involuntarily homeless and that it is impossible for him to avoid being in public while intoxicated. He argues because his public intoxication is a result of his illness and beyond his control, it is inhumane for the state to respond to his condition by subjecting him to penal sanctions.

It is well settled that it is cruel and unusual punishment to impose criminal liability on a person merely for having the disease of addiction. (*Robinson v. California* (1962) 370 U.S. 660, 666–667 [8 L.Ed.2d 758, 82 S.Ct. 1417].) In *Robinson*, the United States Supreme Court invalidated a California statute which made it a misdemeanor to " 'be addicted to the use of narcotics.' " (*Id.* at p. 660.) The *Robinson* court recognized that a state's broad power to provide for the public health and welfare made it constitutionally permissible for it to regulate the use and sale of narcotics, including, for example, such measures as penal sanctions for addicts who refuse to cooperate with compulsory treatment programs. (*Id.* at pp. 664–665.) But the court found the California penal statute unconstitutional because it did not require possession or use of narcotics, or disorderly behavior resulting from narcotics, but rather imposed criminal liability for the mere status of being addicted. (*Id.* at pp. 665–666.) *Robinson* concluded that just as it would be cruel and unusual punishment to make it a criminal offense to be mentally ill or a leper, it was likewise cruel and unusual to allow a criminal conviction for the disease of addiction without requiring proof of narcotics possession or use or antisocial behavior. (*Id.* at pp. 666–667.)

In *Powell v. Texas* (1968) 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145] (*Powell*), the United States Supreme Court, in a five-to-four decision, declined to extend *Robinson*'s holding to circumstances where a chronic alcoholic was convicted of public intoxication, reasoning that the defendant was not convicted merely for being a chronic alcoholic, but rather for being in public while drunk. (*Id.* at p. 532.) That is, the state was not punishing the defendant for his mere status, but rather was imposing "a criminal sanction for public behavior which may create substantial health and safety hazards, both for [the defendant] and for members of the general public . . . ." (*Ibid.*) In the plurality decision, four justices rejected the proposition set forth by four dissenting justices that it was unconstitutional to punish conduct that was " 'involuntary' or 'occasioned by a compulsion.' "[5] (*Id.* at pp. 533–535, 540, 544–545.)

---

[4] We requested supplemental briefing on the issue of "cruel or unusual" punishment under the California Constitution.

[5] The lead opinion written by Justice Marshall and joined by one other justice noted that the record did not show the defendant suffered from an irresistible compulsion to drink and get drunk in public, and that in any event there was no constitutional mens rea requirement. (*Powell, supra,* 392 U.S. at p. 535.) A concurring opinion of two justices expressly rejected

The fifth justice in the *Powell* plurality, Justice White, concurred in the result only, concluding that the issue of involuntary or compulsive behavior could be pivotal to the determination of cruel and unusual punishment, but the record did not show the defendant (who had a home) suffered from any inability to refrain from drinking in public. (*Powell, supra,* 392 U.S. at pp. 548, 553–554 (conc. opn. of White, J.).) Justice White opined that punishing a homeless alcoholic for public drunkenness could constitute unconstitutional punishment if it was impossible for the person to resist drunkenness in a public place. (*Id.* at p. 551.) Relying on Justice White's concurring opinion, Kellogg argues Justice White, who was the deciding vote in *Powell,* would have sided with the dissenting justices had the circumstances of his case (i.e., an involuntarily homeless chronic alcoholic) been presented, thus resulting in a finding of cruel and unusual punishment by a plurality of the Supreme Court.

■ We are not persuaded. Although in *Robinson* the United States Supreme Court held it was constitutionally impermissible to punish for the mere *condition* of addiction, the court was careful to limit the scope of its decision by pointing out that a state may permissibly punish disorderly conduct resulting from the use of narcotics. This limitation was recognized and refined by the plurality opinion in *Powell,* where the court held it was permissible for a state to impose criminal punishment when the addict engages in *conduct* which spills into public areas. As stated in the *Powell* plurality opinion (*Powell, supra,* 392 U.S. at pp. 517, 532) and expressly reflected in the terms of section 647(f), public intoxication is a criminal offense because it can endanger the welfare of the intoxicated individual and the public. (See *People v. Olson* (1971) 18 Cal.App.3d 592, 597 [96 Cal.Rptr. 132].) Indeed, although Justice White's concurring opinion queried whether conviction for public drunkenness might be a violation of the Eighth Amendment for a homeless alcoholic who had no place else to drink, he acknowledged that the dictates of the defendant's and the public's safety made it constitutional for "a police officer to arrest any seriously intoxicated person when he [or she] is encountered in a public place." (*Powell, supra,* 392 U.S. at p. 554, fn. 5 (conc. opn. of White, J.).)

■ Here, the reason Kellogg was subjected to misdemeanor culpability for being intoxicated in public was not because of his *condition* of being a homeless alcoholic, but rather because of his *conduct* that posed a safety hazard. If Kellogg had merely been drunk in public in a manner that did *not* pose a safety hazard (i.e., if he was able to exercise care for his own and the public's safety and was not blocking a public way), he could not have been *adjudicated* guilty under section 647(f). The state has a legitimate

---

any suggestion that findings of voluntariness or compulsion were controlling on the issue of whether a person should be constitutionally immune from punishment. (*Id.* at pp. 540, 544–545.)

need to control public drunkenness when it creates a safety hazard. It would be neither safe nor humane to allow intoxicated persons to stumble into busy streets or to lie unchecked on sidewalks, driveways, parking lots, streets, and other such public areas where they could be trampled upon, tripped over, or run over by cars. The facts of Kellogg's public intoxication in the instant case show a clear potential for such harm. He was found sitting in bushes on a freeway embankment in an inebriated state. It is not difficult to imagine the serious possibility of danger to himself or others had he wandered off the embankment onto the freeway.

■ Although the *Powell* decision rejecting an Eighth Amendment challenge to a public intoxication conviction did not involve a *homeless* alcoholic, the United States Supreme Court has recently made a clear proclamation that penal provisions designed to protect public safety are constitutionally permissible. (*Ewing v. California* (2003) 538 U.S. 11 [123 S.Ct. 1179, 1187–1190, 155 L.Ed.2d 108] [given state's right to provide for public safety, recidivist defendant who received life sentence for grand theft was not subjected to disproportionate sentence constituting cruel and unusual punishment].) The California Supreme Court has likewise indicated that the scope of the California constitutional proscription against cruel or unusual punishment—i.e., punishment that shocks the conscience and offends fundamental notions of human dignity—is to a significant extent defined by whether the penal consequence reasonably advances the state's need to protect its citizenry. (See *People v. Dillon* (1983) 34 Cal.3d 441, 478–479 [194 Cal.Rptr. 390, 668 P.2d 697].)

■ Moreover, although the California Supreme Court has not expressly decided the issue of whether section 647(f) may be unconstitutional as applied to certain chronic alcoholics, it has rejected an attempt to civilly enjoin enforcement of the statute based on an argument that the statute resulted in cruel and/or unusual punishment as applied to chronic, homeless alcoholics. (*Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1119–1121 [232 Cal.Rptr. 814, 729 P.2d 80] (*Sundance*).)[6] The *Sundance* court acknowledged the trial court's finding that "[m]any alcoholics . . . cannot refrain from

---

[6] *Sundance* was a civil action seeking an order enjoining enforcement of section 645(f). (*Sundance, supra,* 42 Cal.3d at p. 1118, fn. 11.) The trial court denied the request for an injunction to prevent enforcement of the statute, but did issue an injunction requiring that various measures be taken to provide for due process and safety and health needs of intoxicated arrestees, including medical screenings and care for alcohol withdrawal. (*Id.* at pp. 1116–1117.)

In rendering its ruling, the trial court found that, although a chronic alcoholic could properly be arrested under section 647(f), he or she could present a constitutional defense based on proof of inability to refrain from being in public while intoxicated either because of disease or indigency. (*Sundance, supra,* 42 Cal.3d at pp. 1117–1118.) The Supreme Court declined to express any views regarding the trial court's finding that section 647(f) was unconstitutional as

appearing in public while intoxicated" because "they are indigent and homeless." (*Id.* at p. 1114.) Nevertheless, after rejecting an argument that the sentences imposed on chronic alcoholics should be viewed in the aggregate, the court concluded that section 647(f) did not impose constitutionally excessive sentences based on the repeated convictions of chronic alcoholics for public intoxication. (*Sundance, supra,* at pp. 1118–1121.)[7] The court noted the maximum sentence that could be imposed for a single violation of section 647(f) was six months. (*Sundance, supra,* at p. 1120.) While recognizing that civil detoxification facilities may be a wiser policy choice, the *Sundance* court also concluded it was not *constitutionally* mandated that chronic alcoholics be sent to such facilities in lieu of jail even though penal incarceration may be counterproductive. (*Id.* at pp. 1125–1127, 1131–1132, and fn. 13.)

■ Based on the guidance provided by *Powell* and *Sundance,* we conclude that the California Legislature's decision to allow misdemeanor culpability for public intoxication, even as applied to a homeless chronic alcoholic such as Kellogg, is neither disproportionate to the offense nor inhumane. In deciding whether punishment is unconstitutionally excessive, we consider the degree of the individual's personal culpability as compared to the amount of punishment imposed. (See *People v. Dillon, supra,* 34 Cal.3d at pp. 480–482, 486.) To the extent Kellogg has no choice but to be drunk in public given the nature of his impairments, his culpability is low; however, the penal sanctions imposed on him under section 647(f) are correspondingly low. (See *Sundance, supra,* 42 Cal.3d at p. 1120.) Given the state's interest in providing for the safety of its citizens, including Kellogg, imposition of low-level criminal sanctions for Kellogg's conduct does not tread on the federal or state constitutional proscriptions against cruel and/or unusual punishment.

The cases cited by Kellogg to support his unconstitutionality argument do not convince us that his position is correct. Two of the cases he cites, which held that criminal culpability for public intoxication imposed on a chronic alcoholic constitutes cruel and unusual punishment (*Driver v. Hinnant* (1966) 356 F.2d 761, 764–765; *Easter v. District of Columbia* (1966) 361 F.2d 50, 54–55), predate the Supreme Court's decision in *Powell* rejecting this proposition. The *Powell* court was aware of both the *Easter* and *Driver* opinions and the rationales presented in these cases. (*Powell, supra,* 392 U.S. at pp. 529–530, fns. 23 and 24 (plur opn.).) In another case cited by Kellogg, the court

---

applied to certain chronic alcoholics, because this portion of the trial court's ruling was not challenged on appeal. (*Sundance, supra,* at p. 1118, fn. 11.)

[7] In his supplemental briefing, Kellogg contends that his punishment shocks the conscience when it is viewed in terms of the aggregate amount of time he has spent in jail because of his repeated arrests and convictions for public intoxication. Following the California Supreme Court's lead in *Sundance,* we reject this argument.

interpreted a statute that prohibited *voluntary* intoxication (with no require-
ment of intoxication in a public place or disorderly conduct), and concluded
the statute was inapplicable to chronic alcoholics. (*State v. Fearon* (1969) 283
Minn. 90 [166 N.W.2d 720, 721–724].) Finally, *City of Dayton v. Sutherland*
(1974) 42 Ohio Misc. 35 [328 N.E.2d 416, 419], which held that it was cruel
and unusual to jail a chronic alcoholic who appeared drunk in public, failed
to mention or discuss *Powell*.[8]

In presenting his argument, Kellogg points to the various impediments to
his ability to obtain shelter and effective treatment, apparently caused by a
myriad of factors including the nature of his condition and governmental
policies and resources, and asserts that these impediments do not justify
criminally prosecuting him. He posits that the Eighth Amendment "mandates
that society do more for [him] than prosecute him criminally and repeatedly
incarcerate him for circumstances which are beyond his control."

We are sympathetic to Kellogg's plight; however, we are not in a position
to serve as policy maker to evaluate societal deficiencies and amelioration
strategies. It may be true that the safety concerns arising from public
intoxication can be addressed by means of civil custody rather than penal
sanctions. (See *Sundance, supra,* 42 Cal.3d at pp. 1115, 1131–1132; *People v.
Ambellas, supra,* 85 Cal.App.3d at p. 39 [149 Cal.Rptr. 680].) Indeed, the
Legislature has provided alternatives to penal sanctions against persons who
are drunk in public, including civil protective custody (§ 647, subd. (g)) and
release without criminal processing (§ 849, subd. (b)(2)). However, the
Legislature has not seen fit to remove the option of criminal prosecution and
conviction. Absent a constitutional violation, it is not our role to second-guess
this policy determination. (See *Sundance, supra,* at p. 1139 [declining
invitation to override legislative judgment by judicially decriminalizing pub-
lic intoxication]; *People v. Ambellas, supra,* at pp. Supp. 39–40.)

---

[8] In addition to the statement in the *Sundance* decision in which the California Supreme
Court declined to reach the issue, several other courts since *Powell* have recognized in dicta
the possibility that compulsion or homelessness may constitute a defense for a chronic
alcoholic charged with public intoxication. (*Budd v. Madigan* (9th Cir. 1969) 418 F.2d 1032,
1034 [noting possibility that compulsion to appear in public while drunk may create immunity
from section 647(f) prosecution, but declining to reach issue on facts showing no compulsion];
*People v. Ambellas* (1978) 85 Cal.App.3d Supp. 24, 29–30 [149 Cal.Rptr. 680] [Eighth
Amendment not violated by section 647(f) conviction of chronic alcoholic who was not
homeless].) Additionally, at least one state court since *Powell* has concluded its state
constitution bars criminally punishing chronic alcoholics for public intoxication. (*State Ex Rel.
Harper v. Zegeer* (1982) 170 W.Va. 743 [296 S.E.2d 873, 875–876]). For the reasons we set
forth above, we do not reach this conclusion.

Kellogg does not contend he was been arbitrarily deprived of alternatives to criminal prosecution in this case (see *People v. Ambellas, supra,* 85 Cal.App.3d at pp. Supp. 32–36); rather, he broadly challenges his misdemeanor conviction as, in and of itself, being cruel and unusual punishment.[9] Thus, our sole task in this appeal is to determine whether Kellogg's conviction constituted cruel and/or unusual punishment. As set forth above, we find no such constitutional infirmity.

## DISPOSITION

The judgment is affirmed.

McConnell, P. J., concurred.

**McDONALD, J.,** Dissenting.—Defendant Thomas Kellogg was convicted of public intoxication under Penal Code section 647, subdivision (f)[1] after the trial court denied his motion to dismiss the charge. Kellogg contended his conviction would be cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution, which applies to California under the Fourteenth Amendment, because he is a homeless, chronic alcoholic. Kellogg asserted the same constitutional issue on appeal of his conviction to the appellate division of the superior court, which affirmed Kellogg's conviction without opinion. This court granted Kellogg's petition for transfer (Cal. Rules of Court, rule 62 et seq.) to consider whether the trial court erred by rejecting Kellogg's Eighth Amendment argument and denying his motion to dismiss.

### FACTUAL AND PROCEDURAL BACKGROUND

On January 10, 2002, San Diego police officers observed Kellogg sitting on the ground under a large bush on a highway embankment. He was rocking back and forth, talking to himself and inexplicably gesturing. He appeared to be intoxicated by alcohol. Kellogg was arrested and charged with the misdemeanor offense of public intoxication (§ 647, subd. (f).)

Kellogg filed a pretrial motion to dismiss the public intoxication charge against him, asserting his conviction of that charge would be cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution because he is homeless and a chronic alcoholic. At an

---

[9] In briefing on appeal, defense counsel states that in San Diego, the option of civil detoxification is often "bypassed in the cases of alcoholics deemed by the City to be 'chronic' or 'serial inebriates.'" The defense does not directly challenge, or cite any evidence of, any such policy. We express no opinion on this matter.

[1] All statutory references are to the Penal Code.

evidentiary hearing on the motion, Kellogg presented the expert testimony of Dr. Terry Schwartz, a psychiatrist who is the associate medical director of the University of California at San Diego (UCSD) outpatient psychiatric services and medical director of UCSD's dual diagnosis treatment program. She estimated that 20 to 30 percent of the program's patients were homeless. Before testifying at the hearing, she interviewed Kellogg and reviewed his arrest reports, his homeless outreach contact sheets, Dr. Gregg Michel's psychological evaluation of him, and his medical records from the UCSD medical center and county jail. She testified alcoholism or alcohol dependence describes persons who are unable to stop drinking alcohol.

Alcoholism is recognized as a mental illness by the American Psychiatric Association. Persons afflicted with this mental illness are psychologically dependent on alcohol and believe they cannot function without it. Their psychological dependence on alcohol interferes with their ability to seek treatment. Persons can also be physically dependent on alcohol and suffer serious withdrawal symptoms, including seizures and possible death, if they abstain from its use. Long-term alcohol dependence can adversely affect a person's central nervous system, possibly causing severe dementia and impairment of his or her ability to learn new information, problem solve, and plan effectively. Alcohol-induced dementia can affect a person's ability to perform simple daily tasks, including applying for a job, finding a residence, or budgeting money. Long-term alcohol dependence is also associated with other psychological disorders, including generalized anxiety, panic disorder, social phobia, depressive disorders, and psychotic disorders. A majority of chronic alcoholics lose their family and social contacts, experience financial difficulty, and have "burned bridges" with hospitals and treatment facilities because of their recidivism.

Schwartz testified it was her opinion that Kellogg is a chronic alcoholic and is alcohol dependent. He suffers from severe cognitive impairment, which may be the result of alcohol use or a previous head injury. His cognitive impairment makes it nearly impossible for him to obtain and maintain an apartment without significant help and support from others. He also suffers from a schizoid personality disorder and posttraumatic stress disorder. Kellogg's efforts to stop drinking alcohol have been unsuccessful. He uses a colostomy bag because of his ulcerative colitis. He also uses certain prescription drugs, including Vicodin and Klonopin. Because residential treatment facilities for alcoholics generally house four patients in a room, a patient like Kellogg, who suffers from social phobias or a schizoid personality disorder, would be uncomfortable and unable to develop the necessary connections with others. In Schwartz's opinion, incarceration is not an effective form of treatment for chronic alcoholics, especially those who are dually diagnosed, because they do not address the major life issues they face on a daily basis. Alcoholism is a risk factor for homelessness. Kellogg has not made use of

various forms of treatment and housing offered to him; intoxication, fear, and lack of trust and rapport with others may have prevented him from using those offered resources. Some homeless persons find the crowded and chaotic conditions of homeless shelters so psychologically disturbing that they prefer to remain outdoors with minimal interaction with people. When asked whether alcoholics are "choosing" to spend money on alcohol rather than other things, Schwartz replied: "I have a difficulty with the word 'choosing,' because I think that—my experience working with this population is that 'choices,' as perhaps you and I may understand it and use our ability to choose, is very different than what they experience. . . . I think that sometimes their capacity—and as I mentioned before, given the cognitive problems—their capacity for planning, executive function is impaired, the memory is impaired, ability to assess consequences and options is impaired, and ability to use options and choices is also impaired. . . . I have a hard time answering that question one way or the other, because I don't—I think 'choice' can be really broadly defined."

Kellogg also presented the expert testimony of Dr. Gregg Michel, a clinical psychologist who specializes in forensic psychology. He has treated patients with psychological disorders associated with chronic alcohol use. Michel conducted a clinical interview and mental status examination of Kellogg and reviewed police reports, jail medical records, and hospital records relating to Kellogg. He also administered several tests to determine Kellogg's cognitive processing. Kellogg was then 44 years old and had been regularly using alcohol since his teenage years. Michel testified that Kellogg suffers from alcohol-induced persisting dementia, which means he has brain damage. Kellogg also had a previous head injury and a history of seizure disorder. Michel diagnosed Kellogg with a schizoid personality disorder. Persons with that disorder tend to be emotionally aloof, with few close friends, and often live a nomadic lifestyle. Kellogg's schizoid personality disorder is secondary to, or resulted from, his alcohol dependence and brain damage. Kellogg is homeless. Michel testified that Kellogg is homeless because he is *incapable* of providing for his own basic needs. Kellogg's substance dependence, head injury, and cognitive dysfunction contributed to his homelessness. Michel considered him to be gravely disabled and unable to work or provide for his food, shelter and clothing because of his cognitive processing and memory problems, which result from his major mental illness. Michel testified that Kellogg's inability to care for himself is "not a choice situation at all." Kellogg's degree of dysfunction is extremely life threatening. Michel testified that Kellogg is homeless because he is unable to accept an offer of a placement in an unlocked shelter or treatment facility. He explained that Kellogg might sleep at a shelter for a night or two, but would wander and

find alcohol. Michel testified that Kellogg's intelligence quotient test score "would be below the first percentile, what we call the mentally retarded area."

The prosecution presented the testimony of San Diego Police Officer Heidi Hawley, who is assigned to the homeless outreach team that assists persons in obtaining shelter and entry to drug and alcohol rehabilitation programs. When she arrested Kellogg on January 10, 2002, he had $445 in his pocket and told her he received about $800 per month in state supplemental income (SSI). Prior to his arrest, she has offered him assistance or services three times, each of which he refused. At the time of his arrest, Kellogg's clothes were filthy, his skin was dirty, and his hair was oily. He has consistently told her that he is homeless.

The prosecution also presented the expert testimony of Dr. James Dunford, a physician who is the medical director of the City of San Diego's emergency medical services. He is not a psychiatrist. Once a month, he treats patients at two local jails. He has experience in treating chronic alcoholics who visit UCSD's emergency medical department. He considers chronic alcoholism a lifelong disease that, with treatment, can be put in remission. The first step in treating chronic alcoholics is to detoxify the patient by withholding alcohol in a medically supervised setting. Withdrawal from alcohol can have deleterious side effects, including shakes, tremors, seizures, and delirium tremens, which are potentially life-threatening. Acute withdrawal symptoms generally last from three to five days. In preparation for his testimony, Dunford reviewed Kellogg's medical records from the jail. Dunford had seen Kellogg at UCSD's emergency medical department and at the jail. Dunford testified that Kellogg is alcohol dependent and has the lifelong disease of chronic alcoholism. An alcohol-dependent person experiencing withdrawal symptoms would drink alcohol were it available. It is highly unlikely that a chronic alcoholic could withdraw from alcohol and remain sober without a support network and psychological counseling. A period of forced sobriety by incarceration is insufficient in itself to sustain lifelong recovery from alcoholism.

After the hearing on Kellogg's motion to dismiss, the trial court made the following findings of fact:

"1. Mr. Kellogg is an alcohol-dependent individual, as defined by the D.S.M. IV, in contrast to an alcohol abuser.

"2. Mr. Kellogg's dependence is both physical and psychological.

"3. Mr. Kellogg's dependence manifests itself in many ways, including the inability to stop drinking, the inability to engage in rational choice-making, in

the view of what those of us who are not affected, members of society, might view [as] choice-making, as well as various physical disorders.

"4. In addition to being alcohol-dependent, Mr. Kellogg's condition is one of [a] chronically alcohol-dependent individual.

"5. Mr. Kellogg is a dually diagnosed individual, meaning that he has both chronic alcohol dependence and a mental disorder.

"6. At the time of his various arrests, Mr. Kellogg was homeless.

"7. At the time of his arrest, Mr. Kellogg was in possession of [$445].

"8. Prior to Mr. Kellogg's arrest, he was offered assistance on at least three prior occasions.

"9. Mr. Kellogg's medical condition improved while in custody."

The trial court denied Kellogg's motion to dismiss the public intoxication charge against him. Following a bench trial, the trial court found Kellogg guilty of public intoxication (§ 647, subd. (f)). The court granted him probation, suspending execution of a 180-day sentence for three years on the condition he complete an alcohol treatment program.[2]

The trial court made no finding that Kellogg at the time of the offense was unable to exercise care for his own safety or the safety of others or that he was interfering with or obstructing the free use of any street, sidewalk or other public way. The record is devoid of any evidence that he was unable to exercise care for himself or others, other than an inability inherent in being intoxicated, or that he interfered in any manner with a public way. On this record, and according to the trial court's findings, Kellogg was convicted solely for being intoxicated in public.

Kellogg appealed his conviction to the Appellate Division of the San Diego County Superior Court. He asserted the criminal prosecution and incarceration of a chronically alcohol-dependent individual, who also suffers from a mental disorder and is homeless, for public intoxication (§ 647, subd. (f)) violates the Eighth Amendment's prohibition against cruel and unusual punishment. The appellate division unanimously affirmed the judgment without issuing an opinion. The appellate division denied Kellogg's petition for a rehearing or, in the alternative, request to certify transfer of the case to this court.

---

[2] The trial court subsequently revoked Kellogg's probation after he was arrested again for public intoxication.

Kellogg timely filed with this court a petition for transfer of his case from the Appellate Division of the Superior Court.[3] This court granted Kellogg's petition for transfer on the issue of whether the trial court erred by rejecting his Eighth Amendment argument and denying his motion to dismiss.[4] The parties submitted supplemental briefs on the issue of whether Kellogg's section 647, subdivision (f) conviction violates article I, section 17 of the California Constitution, which bars infliction of cruel or unusual punishment.

## DISCUSSION

### I

*Cruel and Unusual Punishment under the Eighth Amendment of the United States Constitution*

Kellogg contends his section 647, subdivision (f) conviction for public intoxication constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

### A

Section 647 provides: "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: [¶] . . . [¶] (f) Who is found in any public place under the influence of intoxicating liquor . . . in such a condition that he or she is unable to exercise care for his or her own safety or the safety of others, or . . . interferes with or obstructs . . . the free use of any street, sidewalk, or other public way."

The Eighth Amendment of the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*." (Italics added.)

In *Robinson v. California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417], the Supreme Court, without discussion, invoked the due process clause of the Fourteenth Amendment to apply the Eighth Amendment to state criminal prosecutions. (*Robinson,* at pp. 666–667.) *Robinson* held that because a California statute that made it "a criminal offense for a person to 'be

---

[3] Pursuant to California Rules of Court, rule 64(b)(2), a party's petition for transfer must be served and filed within eight days after the appellate division's judgment is final.

[4] The appellate court may order a case transferred to it for a hearing and decision if it concludes transfer is necessary to settle an important question of law. (Cal. Rules of Court, rules 62, 64.)

addicted to the use of narcotics' " punished a defendant for the "status" of narcotic addiction, that statute violated the Eighth and Fourteenth Amendments. (*Robinson,* at pp. 660, 666–667.) The court stated: "This statute . . . is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. . . . Rather, we deal with a statute which makes the 'status' of narcotic addiction a criminal offense . . . . [¶] It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. [Citation.]" (*Robinson, supra,* at p. 666.)

In *Driver v. Hinnant* (4th Cir. 1966) 356 F.2d 761, the court applied the holding in *Robinson* to bar the conviction of a chronic alcoholic for the misdemeanor offense of public intoxication. (*Driver,* at pp. 764–765.) The evidence in *Driver* "conclusively proved [the appellant is] a chronic alcoholic, his inebriation in public view an involuntary exhibition of the infirmity." (*Id.* at p. 763.) The court distinguished between mere excessive (e.g., steady or spree) voluntary drinkers and addicted or involuntary drinkers (i.e., chronic alcoholics). (*Id.* at p. 764.) *Driver* stated:

"This addiction—chronic alcoholism—is now almost universally accepted medically as a disease. The symptoms . . . may appear as [a] 'disorder of behavior.' Obviously, this includes appearances in public, as here, unwilled and ungovernable by the victim. When that is the conduct for which he is criminally accused, there can be no judgment of criminal conviction passed upon him. To do so would affront the Eighth Amendment, as cruel and unusual punishment in branding him a criminal, irrespective of consequent detention or fine.

"Although his misdoing objectively comprises the physical elements of a crime, nevertheless no crime has been perpetrated because the conduct was neither actuated by an evil intent nor accompanied with a consciousness of wrongdoing, indispensable ingredients of a crime. [Citation.] . . . The alcoholic's presence in public is not his act, for he did not will it. It may be likened to the movements of an imbecile or a person in delirium of a fever. None of them by attendance in the forbidden place defy the forbiddance.

"This conclusion does not contravene the familiar thesis that voluntary drunkenness is no excuse for crime. The chronic alcoholic has not drunk voluntarily, although undoubtedly he did so originally. His excess now derives from disease. However, *our excusal of the chronic alcoholic from criminal prosecution is confined exclusively to those acts on his part which are compulsive as symptomatic of the disease.* With respect to other behavior—not characteristic of confirmed chronic alcoholism—he would be judged as would any person not so afflicted.

". . . [T]he North Carolina statute does not punish them solely for drunkenness, but rather for its public demonstration. But *many of the diseased have no homes or friends, family or means to keep them indoors.* [The appellant] examples this pitiable predicament, for he is apparently without money or restraining care.

"*Robinson v. State of California, supra,* 370 U.S. 660 . . . sustains, if not commands, the view we take. . . . The California statute criminally punished a 'status'—drug addiction—involuntarily assumed; *the North Carolina Act criminally punishes an involuntary symptom of a status—public intoxication.* In declaring the former violative of the Eighth Amendment, we think pari ratione, the *Robinson* decision condemns the North Carolina law when applied to one in the circumstances of appellant Driver. *All of the opinions recognize the inefficacy of such a statute when it is enforced to make involuntary deportment a crime.*" (*Driver, supra,* at pp. 764–765, italics added.)

*Driver* concluded: "[T]he State cannot stamp an unpretending chronic alcoholic as a criminal if his drunken public display is involuntary as the result of disease." (*Id.* at p. 765.)

In *Easter v. District of Columbia* (D.C. Cir. 1966) 361 F.2d 50, the court held that chronic alcoholism was a defense to a criminal charge of public intoxication under a District of Columbia statute. (*Id.* at pp. 51, 55.) The majority opinion in *Easter* was based on an interpretation that another District of Columbia statute providing for civil rehabilitation of chronic alcoholics showed a legislative intent not to criminalize public intoxication of chronic alcoholics.[5] (*Id.* at pp. 51–53.) *Easter* reasoned: "An essential element of criminal responsibility is the ability to avoid the conduct specified

---

[5] That other District of Columbia statute providing for civil rehabilitation of chronic alcoholics defined a "chronic alcoholic" as "any person who chronically and habitually uses alcoholic beverages to the extent that he *has lost the power of self-control with respect to the use of such beverages,* or while under the influence of alcohol endangers the public morals, health, safety, or welfare." (*Easter v. District of Columbia, supra,* 361 F.2d at p. 52, italics added.)

in the definition of the crime. Action within the definition is not enough. . . . In [the] case of a chronic alcoholic Congress has dealt with his condition so that in this jurisdiction he . . . cannot be held to be guilty of the crime of being intoxicated because, as [that civil rehabilitation statute] recognizes, he has lost the power of self-control in the use of intoxicating beverages. In his case an essential element of criminality, where personal conduct is involved, is lacking. This element is referred to in the law as the criminal mind.. [Citation.]"[6] (*Id.* at p. 52.) However, a plurality of four justices also concluded the result was supported by the reasoning in *Robinson* and *Driver*, stating: "Our decision would be the same were we without the guidance furnished by the [civil rehabilitation statute]. One who is a chronic alcoholic cannot have the *mens rea* necessary to be held responsible criminally for being drunk in public. . . . [A] chronic alcoholic is in fact a sick person who has lost control over his use of alcoholic beverages. . . . [¶] The same basic problem now before us was recently before the Court of Appeals for the Fourth Circuit in *Driver v. Hinnant*, [*supra*], 356 F.2d 761. . . . [¶] . . . [¶] We hold, therefore, by reason of the [civil rehabilitation statute], for the independent reasons which underlay the theory of that [statute], and on the precedential authority of *Driver*, . . . that the public intoxication of a chronic alcoholic lacks the essential element of criminality; and to convict such a person of that crime would also offend the Eighth Amendment." (*Easter, supra,* at pp. 53–55, fns. omitted.)

In *Powell v. Texas* (1968) 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145], the Supreme Court addressed the issue of whether it is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to convict a chronic alcoholic of a public intoxication charge. (*Powell*, at pp. 517, 531.) Although the court affirmed the defendant's conviction, there was no majority opinion. (*Id.* at pp. 516–517 [537 88 S.Ct. 2145].) After a bench trial, the trial court made the following findings of fact:

" '(1) That chronic alcoholism is a disease which destroys the afflicted person's will power to resist the constant, excessive consumption of alcohol.

" '(2) That a chronic alcoholic does not appear in public by his own volition but under a compulsion symptomatic of the disease of chronic alcoholism.

" '(3) That Leroy Powell, defendant herein, is a chronic alcoholic who is afflicted with the disease of chronic alcoholism.' " (*Id.* at p. 521.)

---

[6] *Easter* limited its holding, stating: "We desire to make clear, however, that we are not absolving the voluntarily intoxicated person of criminal responsibility for crime in general under applicable law. [Citation.]" (*Easter v. District of Columbia, supra,* 361 F.2d at p. 53.)

In the plurality opinion joined by three other justices, Justice Marshall concluded that the trial court's findings were not "findings of fact," but were "the premises of a syllogism transparently designed to bring this case within the scope of this Court's opinion in *Robinson v. California,* [*supra,* 370 U.S. 660]." (*Powell,* at p. 521 (plur. opn. of Marshall, J.).) The plurality opinion also stated: "[T]here is no agreement among members of the medical profession about what it means to say that 'alcoholism' is a 'disease.' " (*Id.* at p. 522.) It further stated that "since appellant was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion[,]" the instant case did not fall within *Robinson*'s holding because Texas did not seek to punish appellant's status but rather his public behavior. (*Id.* at p. 532.) The plurality opinion concluded: "We are unable to conclude, on the state of this record or on the current state of medical knowledge, that chronic alcoholics in general, and [appellant] in particular, suffer from such an irresistible compulsion to drink and to get drunk in public that they are utterly unable to control their performance of either or both of these acts and thus cannot be deterred at all from public intoxication." (*Id.* at p. 535.)

In the dissenting opinion in *Powell* joined by three other justices, Justice Fortas accepted the trial court's findings of fact and phrased the issue before the court as "whether a criminal penalty may be imposed upon a person suffering the disease of 'chronic alcoholism' for a condition—being 'in a state of intoxication' in public—which is a characteristic part of the pattern of his disease and which, the trial court found, was not the consequence of appellant's volition but of 'a compulsion symptomatic of the disease of chronic alcoholism.' " (*Powell v. Texas, supra,* 392 U.S. at p. 558 (dis. opn. of Fortas, J.).) The dissenting opinion stated that the case did not "concern the responsibility of an alcoholic for criminal *acts.* We deal here with the mere *condition* of being intoxicated in public."[7] (*Id.* at p. 559, fn. omitted.) It further stated: "It is entirely clear that the jailing of chronic alcoholics is punishment. It is not defended as therapeutic, nor is there any basis for claiming that it is therapeutic (or indeed a deterrent)." (*Id.* at p. 564.) It interpreted *Robinson*'s holding as being based on the principle that "[c]riminal penalties may not be inflicted upon a person for being in a condition he is powerless to change." (*Powell,* at p. 567.) The dissenting

---

[7] The dissenting opinion noted: "It is not foreseeable that findings such as those . . . decisive here—namely that the appellant's being intoxicated in public was a part of the pattern of his disease and due to a compulsion symptomatic of that disease—could or would be made in the case of offenses such as driving a car while intoxicated, assault, theft, or robbery. Such offenses require independent acts or conduct and do not typically flow from and are not part of the syndrome of the disease of chronic alcoholism. If an alcoholic should be convicted for criminal conduct which is not a characteristic and involuntary part of the pattern of the disease as it afflicts him, nothing herein would prevent his punishment." (*Powell v. Texas, supra,* 392 U.S. at p. 559, fn. 2.)

opinion reasoned: "In the present case, appellant is charged with a crime composed of two elements—being intoxicated and being found in a public place while in that condition. The crime, so defined, differs from that in *Robinson*. The statute covers more than a mere status. But the essential constitutional defect here is the same as in *Robinson*, for in both cases the particular defendant was accused of being in a condition which he had no capacity to change or avoid. The trial judge sitting as a trier of fact found, upon the medical and other relevant testimony, that [appellant] is a 'chronic alcoholic.' He defined appellant's 'chronic alcoholism' as 'a disease which destroys the afflicted person's will power to resist the constant, excessive consumption of alcohol.' He also found that 'a chronic alcoholic does not appear in public by his own volition but under a compulsion symptomatic of the disease of chronic alcoholism.' I read these findings to mean that appellant was powerless to avoid drinking; that having taken his first drink, he had 'an uncontrollable compulsion to drink' to the point of intoxication; and that, once intoxicated, he could not prevent himself from appearing in public places." (*Powell v. Texas, supra,* 392 U.S. at pp. 567–568 (dis. opn. of Fortas, J.), fns. omitted.) The dissenting opinion concluded: "[H]ere the findings of the trial judge call into play the principle that *a person may not be punished if the condition essential to constitute the defined crime is part of the pattern of his disease and is occasioned by a compulsion symptomatic of the disease.* This principle, narrow in scope and applicability, is implemented by the Eighth Amendment's prohibition of 'cruel and unusual punishment,' as we construed that command in *Robinson.*" (*Id.* at p. 569 (dis. opn. of Fortas, J.), italics added.)

Justice White concurred in the result, providing the fifth vote for affirmance of the defendant's conviction for public intoxication but without joining the plurality opinion. (*Powell v. Texas, supra,* 392 U.S. at p. 554 (conc. opn. of White, J.).) In his separate concurring opinion, Justice White appeared to adopt the premise of the dissenting opinion that chronic alcoholics should not be criminally convicted for yielding to their compulsion to drink. (*Id.* at pp. 548–549.) Interpreting *Robinson*, he reasoned: "If it cannot be a crime to have an irresistible compulsion to use narcotics, *Robinson v. California,* [*supra,* 370 U.S. 660], I do not see how it can constitutionally be a crime to yield to such a compulsion. Punishing an addict for using drugs convicts for addiction under a different name. Distinguishing between the two crimes is like forbidding criminal conviction for being sick with flu or epilepsy but permitting punishment for running a fever or having a convulsion. Unless *Robinson* is to be abandoned, the use of narcotics by an addict must be beyond the reach of the criminal law. Similarly, the chronic

alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or for being drunk." (*Powell v. Texas, supra,* 392 U.S. at pp. 548–549 (conc. opn. of White, J.).) Because the appellant's conviction was for being intoxicated in public, "even if [appellant] was compelled to drink, and so could not constitutionally be convicted for drinking, his conviction in this case can be invalidated only if there is a constitutional basis for saying that he may not be punished for being in public while drunk." (*Id.* at p. 549 (conc. opn. of White, J.).) "No question is raised about applying this statute to the nonchronic drunk, who has no compulsion to drink, who need not drink to excess, and who could have arranged to do his drinking in private or, if he began drinking in public, could have removed himself at an appropriate point on the path toward complete inebriation." (*Ibid.*) Justice White noted that the record did *not* support the trial court's finding that the appellant was a chronic alcoholic who had a compulsion to drink excessively and frequent public places when intoxicated. (*Ibid.*) He stated: "The sober chronic alcoholic has no compulsion to be on the public streets; many chronic alcoholics drink at home and are never seen drunk in public. Before and after taking the first drink, and until he becomes so drunk that he loses the power to know where he is or to direct his movements, *the chronic alcoholic with a home or financial resources is as capable as the nonchronic drinker of doing his drinking in private, of removing himself from public places and, since he knows or ought to know that he will become intoxicated, of making plans to avoid his being found drunk in public.* For these reasons, I cannot say that the chronic alcoholic who proves his disease and a compulsion to drink is shielded from conviction when he has knowingly failed to take feasible precautions against committing a criminal act, here the act of going to or remaining in a public place. On such facts the alcoholic is like a person with smallpox, who could be convicted for being on the street but not for being ill, or, like the epileptic, who could be punished for driving a car but not for his disease." (*Powell, supra,* 392 U.S. at pp. 549–550 (conc. opn. of White, J.), italics added, fn. omitted.)

Interpreting *Robinson*, Justice White noted: "The proper subject of inquiry is whether volitional acts brought about the 'condition' and whether those acts are sufficiently proximate to the 'condition' for it to be permissible to impose penal sanctions on the 'condition.' " (*Powell v. Texas supra,* 392 U.S. at pp. 550–551, fn. 2.) In language particularly pertinent to the instant case, Justice White observed: "The fact remains that some chronic alcoholics must drink and hence must drink *somewhere. Although many [chronic alcoholics] have homes, many*

*others do not. For all practical purposes the public streets may be home for these unfortunates, not because their disease compels them to be there, but because, drunk or sober, they have no place else to go and no place else to be when they are drinking.* This is more a function of economic station than of disease, although the disease may lead to destitution and perpetuate that condition. *For some of these alcoholics I would think a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans a single act for which they may not be convicted under the Eighth Amendment—the act of getting drunk."* (*Id.* at p. 551 (conc. opn. of White, J.), italics added, fn. omitted.)

He further observed: "It is also possible that the chronic alcoholic who begins drinking in private at some point becomes so drunk that he loses the power to control his movements and for that reason appears in public. The Eighth Amendment might also forbid conviction in such circumstances, but only *on a record satisfactorily showing that it was not feasible for him to have made arrangements to prevent his being in public when drunk* and that his extreme drunkenness sufficiently deprived him of his faculties on the occasion in issue." (*Powell v. Texas, supra,* 392 U.S. at pp. 551–552, italics added.) However, Justice White concluded that the record in *Powell* did not show the appellant "could not have done his drinking in private or that he was so inebriated at the time that he had lost control of his movements and wandered into the public street." (*Id.* at p. 553.) He stated: "Indeed, the evidence in the record strongly suggests that [the appellant] could have drunk at home and made plans while sober to prevent ending up in a public place. [The appellant] had a home and wife, and if there were reasons why he had to drink in public or be drunk there, they do not appear in the record." (*Ibid.*) Because the appellant "made no showing that he was unable to stay off the streets on the night in question," Justice White concluded the appellant had not shown his conviction constituted cruel and unusual punishment under the Eighth Amendment and therefore Justice White concurred in the judgment affirming the appellant's public intoxication conviction without joining the plurality opinion. (*Powell,* at p. 554.)

## B

Kellogg contends that had the record in *Powell* shown the defendant was homeless and unable to avoid being in public while intoxicated, Justice White would have joined the four dissenting justices and reversed the defendant's conviction as constituting cruel and unusual punishment in violation of the Eighth Amendment. Kellogg does not challenge the constitutionality of section 647, subdivision (f) facially, but rather as it was applied to him in the circumstances of this case. He argues that because the record in this case

shows he is involuntarily homeless, a chronic alcoholic, and unable to avoid being in public while intoxicated, his public intoxication conviction constitutes cruel and unusual punishment in violation of the Eighth Amendment and must be reversed.

*Powell* supports Kellogg's contention. Justice White's concurring opinion in *Powell* strongly suggests that he would have joined the four dissenting justices had the record in that case shown the defendant was a chronic alcoholic who was not homeless by choice and therefore could not have done his drinking in private or avoid being in public while intoxicated. Justice White's concurring opinion noted that many chronic alcoholics do not have homes. (*Powell v. Texas, supra,* 392 U.S. at p. 551 (conc. opn. of White, J.).) One authority has observed that Justice White's concurring opinion "left no doubt that on the substantive question [in *Powell*] he sided with the dissenting Justices. His disagreement with the dissenters was on a question of fact. The evidence failed to show that the [defendant] was compelled to be intoxicated in a public place. He conceded that many alcoholics have no homes, and in such cases public intoxication is in fact a symptom of [their] status." (3 Cook, Constitutional Rights of the Accused (3d ed. 1996) Punishment, § 26:8, pp. 26-30 through 26-31, fn. omitted.) That authority concluded: "The upshot of the *Powell* decision would appear to be that all members of the Court would hold punishment of the status of alcoholism unconstitutional under the *Robinson* rationale. Five members of the Court would extend the 'status crime' rationale to matters other than 'mere' status, in the instance of narcotics addiction and chronic alcoholism, if the conduct were compelled by the condition." (*Id.* at p. 26-31.)[8]

Although Justice White's discussion in his concurring opinion regarding homelessness is not binding on this court, I nevertheless am persuaded by his reasoning and agree with his proposed result in circumstances involving chronic alcoholics who are involuntarily homeless. Since the *Powell* decision in 1968, the United States Supreme Court has not accepted any public intoxication cases and has not addressed the hypothetical circumstances posed by Justice White in his concurring opinion in *Powell*. (Robinson, *supra,* 26 Am. J. Crim. Law at p. 437.) Furthermore, the parties do not cite, and research has not revealed, any cases that address the issue of whether a chronic alcoholic who is involuntarily homeless can be convicted of public

---

[8] Interestingly, in an initial vote of the justices, Justice White sided with Justices Douglas, Brennan, Stewart, and Fortas (ultimately the four dissenting justices) to reverse the appellant's conviction, but later switched his vote and wrote a separate concurring opinion. (Robinson, *Powell v. Texas: The Case of the Intoxicated Shoeshine Man Some Reflections a Generation Later by a Participant* (1999) 26 Am. J. Crim. Law 401, 427.)

intoxication without violating the Eighth Amendment. Accordingly, the issue in this case appears to be one of first impression in the state and federal *appellate* courts.[9]

In the circumstances of this case, Kellogg's conviction for being intoxicated in public constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments because the record shows he is involuntarily homeless and, as a chronic alcoholic who is unable to stop drinking, cannot avoid being intoxicated in public. In effect, Kellogg was convicted not for merely being a chronic alcoholic who was found intoxicated in public, but for his status or condition of being *homeless*, which is not of his choosing.[10] Therefore, this case is within the general reasoning of *Robinson*, albeit an extension of its holding in accordance with Justice White's concurring opinion in *Powell*. Because a person who is involuntarily homeless cannot avoid appearing in public, that person should not be criminally liable for acts (e.g., such as being intoxicated) that, if done in private by others, are not considered criminal acts. This is particularly true when, as in this case, that person is a chronic alcoholic and is unable to avoid performing those acts (e.g., drinking and becoming intoxicated). Furthermore, because an involuntarily homeless person could not be criminally liable for eating and becoming satiated in public, that person should not be criminally liable for drinking and being intoxicated in public. In the circumstances of this case, *if* Kellogg had a home and became intoxicated in and remained in his home, he could not be convicted for his conduct. Therefore, Kellogg should not be treated differently merely because of his status or condition of being involuntarily homeless. Kellogg's conduct was not only symptomatic of his chronic alcoholism, but also "symptomatic" of his involuntary homelessness. Therefore, Kellogg's section 647, subdivision (f) conviction for public intoxication

---

[9] The *trial* court in *Sundance v. Municipal Court* (1986) 42 Cal.3d 1101 [232 Cal.Rptr. 814, 729 P.2d 80] concluded section 647, subdivision (f) violated the cruel and/or unusual punishment clauses of the federal and state Constitutions as applied to a chronic alcoholic who proves "he is '(1) unable to refrain from drinking alcohol to the point where he is [un]able to care for himself or others, and (2) unable (a) by reason of the disease, or (b) indigency, to refrain from being in public while intoxicated.' " (*Sundance,* at pp. 1117–1118.) Although the California Supreme Court affirmed the trial court's injunction against the governmental defendants, it did *not* address the Eighth Amendment issue. (*Sundance,* at p. 1118, fn. 11.) *Sundance* noted: "Since defendants do not challenge the trial court's finding that section 647(f) is unconstitutional as applied to certain chronic alcoholics, this court expresses no view as to the propriety of that finding." (*Ibid.*)

[10] The linguistic debate regarding the meaning and scope of the terms "status" and "condition" and whether the Eighth Amendment prohibits punishment of both or only status, as argued in the plurality and dissenting opinions in *Powell,* is unhelpful. (*Powell v. Texas, supra,* 392 U.S. at pp. 533–534 (plur. opn. of Marshall, J.); *id.* at pp. 567–568 (dis. opn. of Fortas, J.).) Regardless of the label applied to Kellogg and his homelessness, it is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to convict an involuntarily homeless, chronic alcoholic of the crime of public intoxication.

effectively punishes him for being involuntarily homeless. In addition to the support for this conclusion provided by Justice White's concurring opinion in *Powell*, the *plurality* opinion in *Powell* also supports this conclusion. Justice Marshall wrote in his plurality opinion: "We are unable to conclude, on the state of this record or on the current state of medical knowledge, that chronic alcoholics in general, and [appellant] in particular, suffer from such an irresistible compulsion to drink and to get drunk in public that they are utterly unable to control their performance of either or both of these acts and thus cannot be deterred at all from public intoxication." (*Powell v. Texas, supra,* 392 U.S. at p. 535 (plur. opn. of Marshall, J.).) Unlike the four justices joining the plurality opinion in *Powell*, I *am* able to "conclude, on the state of this record . . . , that [Kellogg] suffer[s] from such an irresistible compulsion to drink and to get drunk in public[, which he is unable to avoid as an involuntarily homeless person,] that [he is] utterly unable to control [his] performance of either or both of these acts and thus cannot be deterred at all from public intoxication." (*Ibid.*) Therefore, it is reasonable to surmise that had the *Powell* court been presented with the circumstances in this case, *all nine justices* of the United States Supreme Court would have concluded it is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to convict an involuntarily homeless, chronic alcoholic of the crime of public intoxication.

Review of the record shows Kellogg is involuntarily homeless and a chronic alcoholic with a past head injury who suffers from dementia, severe cognitive impairment, and a schizoid personality disorder. At the hearing on Kellogg's motion to dismiss, all three expert witnesses agreed, and the trial court found, that Kellogg is alcohol dependent and a chronic alcoholic. Schwartz and Michel testified that Kellogg has severe cognitive impairment and suffers from a schizoid personality disorder. Michel testified that Kellogg suffers from dementia. Dunford, the prosecution's emergency medical care and alcoholism expert, did not testify on Kellogg's illnesses other than his chronic alcoholism. Therefore, the prosecution effectively conceded that Kellogg suffers from dementia, severe cognitive impairment, and a schizoid personality disorder.[11] The evidence also shows, and the trial court found, Kellogg was homeless at the time of his arrest. Officer Hawley testified that at the time of his arrest, Kellogg's clothes were filthy, his skin dirty, and his hair oily. Also, Kellogg has consistently told her that he is homeless.

---

[11] The trial court found that Kellogg "is a dually diagnosed individual, meaning that he has both chronic alcohol dependence and a mental disorder." Considering the uncontradicted record in this case, the trial court's reference to Kellogg's mental disorder includes his dementia, severe cognitive impairment, and schizoid personality disorder.

Although Officer Hawley apparently offered Kellogg assistance on three occasions, declaration of assistance is insufficient to show his homelessness is voluntary. Kellogg's possession of $445 in his pocket and receipt of about $800 per month in SSI are insufficient to show he is voluntarily homeless. On the contrary, the record shows Kellogg is *involuntarily* homeless. Michel testified that Kellogg is homeless because he is *incapable* of providing for his own basic needs. Kellogg's substance dependence, head injury, and cognitive dysfunction contributed to his homelessness. Michel considered him to be gravely disabled and unable to work or provide for his food, shelter and clothing because of his cognitive processing and memory problems, which result from his major mental illness. Michel testified that Kellogg's inability to care for himself is "not a choice situation at all." Because the prosecution did not present any evidence refuting Michel's testimony regarding Kellogg's inability or incapacity to provide for his own needs, including a home, the evidence is uncontradicted that Kellogg is involuntarily homeless. The fact that the trial court found Kellogg to be homeless, without deciding whether he is voluntarily or involuntarily homeless, does not preclude the conclusion that the record shows Kellogg is involuntarily homeless. In any event, the trial court expressly found that Kellogg's alcohol dependence manifested itself in his inability to stop drinking alcohol and "inability to engage in rational choice-making." That finding shows Kellogg did not "choose" to be homeless and supports the conclusion that Kellogg is *involuntarily* homeless.

Because Kellogg is involuntarily homeless and a chronic alcoholic with a past head injury who suffers from dementia, severe cognitive impairment, and a schizoid personality disorder, and there is no evidence he was unable by reason of his intoxication to care for himself or others, other than inability inherent in intoxication, or interfered in any manner with a public way, his section 647, subdivision (f) conviction solely for being intoxicated in public constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.[12] Accordingly, the trial court erred by denying Kellogg's motion to dismiss the section 647, subdivision (f) charge against him.

The majority opinion appears to be based on the premise that Kellogg's conduct posed a safety hazard and showed a clear potential for harm (maj. opn., *ante*, pp. 602–603) and therefore his conviction was not merely for being intoxicated in public. Section 647, subdivision (f) punishes a person for being intoxicated in public "in such a condition that he or she is unable to

---

[12] Because the record in this case shows Kellogg was involuntarily homeless, it is unnecessary to decide whether a *voluntarily* homeless, chronic alcoholic can be constitutionally convicted of public intoxication. (Cf. *Driver v. Hinnant, supra,* 356 F.2d at pp. 764–765 [holding public intoxication conviction of chronic alcoholic violates Eighth Amendment]; *Easter v. District of Columbia, supra,* 361 F.2d at pp. 53–55 (plur. opn. of Fahy, J.) [same].)

exercise care for his or her own safety or the safety of others, or . . . interferes with or obstructs . . . the free use of any street, sidewalk, or other public way." (§ 647, subd. (f).) However, the trial court did not find and the record is devoid of evidence showing that Kellogg was unable to care for his own safety or the safety of others or interfered with or obstructed any street, sidewalk or other public way. The record shows only that Kellogg was sitting under a bush on a highway embankment. That evidence is insufficient to support a finding he was actually interfering with or obstructing that highway or was unable to care for his or others' safety. The majority opinion permits the mere potential or possibility that Kellogg would interfere with or obstruct that highway or become unable to care for his or others' safety to be sufficient for a section 647, subdivision (f) conviction, which is therefore a conviction for simply being homeless and intoxicated in public.

## C

The cases cited by the People do not support a contrary conclusion. *Budd v. Madigan* (9th Cir. 1969) 418 F.2d 1032 is factually inapposite because the defendant in that case was steadily employed and refrained from drinking during the work week. (*Id.* at p. 1034.) *Budd* did not involve or address the issue of whether an involuntarily homeless, chronic alcoholic could constitutionally be convicted of public intoxication. Although the court in *In re Spinks* (1967) 253 Cal.App.2d 748 [61 Cal.Rptr. 743] concluded the petitioner's section 647, subdivision (f) public intoxication conviction did not punish him for his status as a chronic alcoholic in violation of the *Robinson* holding, that case is factually inapposite because the petitioner had a home.[13] (*Spinks,* at pp. 750–752.) Furthermore, *Spinks* was decided before *Powell* and therefore could not consider Justice White's concurring opinion in *Powell*. *Spinks* did not consider the issue of whether an involuntarily homeless, chronic alcoholic could constitutionally be convicted of public intoxication.[14] *People v. Ambellas* (1978) 85 Cal.App.3d Supp. 24 [149 Cal.Rptr. 680] is factually inapposite and merely followed the holding in *Spinks*. (*Ambellas,* at p. 30.) In *Ambellas*, the referee expressly found that the defendant was not homeless. (*Id.* at p. 29.) *Ambellas* concluded: "[T]he alleged unconstitutionality of [section 647, subdivision (f)] as to a defendant who is not homeless was rejected in *Spinks* based on the same arguments raised here. We are

---

[13] In *Spinks*, the court noted that the petitioner testified the reason he had not been arrested more often for public intoxication was because his " 'drinking was mainly done at home' or by himself." (*In re Spinks, supra,* 253 Cal.App.2d at p. 750.)

[14] *People v. Omori* (1972) 25 Cal.App.3d 616, 618–621 [102 Cal.Rptr. 64], and *People v. Zapata* (1963) 220 Cal.App.2d 903, 905–907 [34 Cal.Rptr. 171], cited by the People, are factually inapposite, holding only that conviction of drug addicts for drug possession is not punishment of status in violation of the Eighth Amendment under *Robinson*. Neither case involved or addressed the issue of whether an involuntarily homeless, chronic alcoholic could constitutionally be convicted of public intoxication.

bound by that decision. [Citation.]" (*Id.* at p. 30.) *Joyce v. City and County of San Francisco* (N.D. Cal. 1994) 846 F.Supp. 843 is inapposite because it did not involve a criminal prosecution for public intoxication, but rather a civil action by homeless plaintiffs for a preliminary injunction to enjoin a multifaceted municipal program dealing with the homeless population. (*Id.* at pp. 845–850.) Although the federal district court judge in *Joyce* concluded homelessness is not a status protected by the Eighth Amendment, that conclusion is not binding on this court and, in any event, the reasoning in *Joyce* is not convincing. (*Id.* at pp. 853–858.) *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069 [40 Cal.Rptr.2d 402, 892 P.2d 1145] is inapposite because the Supreme Court in that case addressed only a *facial* challenge of an ordinance making certain camping on public property illegal. (*Id.* at. pp. 1083, 1104, fn. 19.) Because the appellants did *not* challenge the ordinance *as applied* to certain individuals and did not present any evidence on its application, the court did not address the issue of whether the application of that ordinance to involuntarily homeless persons who camp on public property punished those persons for their status or otherwise violated the Eighth and Fourteenth Amendments. (*Tobe,* at p. 1104, fn. 19.)

The record does not support the People's assertion that Kellogg's homelessness was by choice. In support of their assertion, the People cite the testimony of Officer Hawley that she had offered Kellogg assistance on three occasions and each time he declined help. Considering the extensive expert testimony in the record regarding Kellogg's chronic alcoholism, dementia, severe cognitive impairment, and schizoid personality disorder, his rejection of generalized offers of assistance cannot be viewed as a "choice" or voluntary decision by Kellogg to remain homeless.

Although the People assert that incarceration of Kellogg provides him with treatment similar to or better than he would receive were he civilly committed, the quality of his treatment in jail does not prevent his criminal conviction from constituting cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. As Justice Fortas stated in his dissenting opinion in *Powell*: "It is entirely clear that the jailing of chronic alcoholics is punishment. It is not defended as therapeutic, nor is there any basis for claiming that it is therapeutic (or indeed a deterrent). The alcoholic offender is caught in a 'revolving door'—leading from arrest on the street through a brief, unprofitable sojourn in jail, back to the street and, eventually, another arrest. The jails, overcrowded and put to a use for which they are not suitable, have a destructive effect upon alcoholic inmates." (*Powell v. Texas, supra,* 392 U.S. at pp. 564–565 (dis. opn. of Fortas, J.), fns. omitted.)

In any event, the evidence in the record does not support the People's assertion.

## II

*Cruel or Unusual Punishment under the California Constitution*

The parties submitted supplemental briefs on the issue of whether Kellogg's section 647, subdivision (f) public intoxication conviction violates article I, section 17 of the California Constitution, which provides: "*Cruel or unusual punishment may not be inflicted* or excessive fines imposed." (Italics added.) This issue appears to be one of first impression in the California courts.[15]

Because the delegates to the Constitutional Convention in 1849 chose to use the disjunctive "or" in language adopted for the California Constitution's original provision prohibiting cruel or unusual punishment, rather than the conjunctive "and" as used in similar provisions in the federal and other states' Constitutions, the framers of the California Constitution intended that both cruel punishment and unusual punishment be prohibited. (*People v. Anderson* (1972) 6 Cal.3d 628, 634–637 [100 Cal.Rptr. 152, 493 P.2d 880], abrogated on other grounds by constitutional amendment as noted in *People v. Hill* (1992) 3 Cal.4th 959, 1015 [13 Cal.Rptr.2d 475, 839 P.2d 984].) Furthermore, article I, section 24 of the California Constitution provides: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution."[16] Therefore, the scope of article I, section 17 of the California Constitution is not limited by the scope of the Eighth Amendment of the United States Constitution and may prohibit cruel *or* unusual punishments that may not be cruel *and* unusual punishment under the Eighth Amendment. (*People v. Smithey* (1999) 20 Cal.4th 936, 1019–1020, fn. 1 [86 Cal.Rptr.2d 243, 978 P.2d 1171] (conc. opn. of Mosk, J.) ["The state constitutional provision [Cal. Const., art. I, § 17] is broader than its federal constitutional counterpart [U.S. Const., 8th Amend.]. [Citation.] Hence, it necessarily extends at least as far in its protection."].)

---

[15] See footnote 9, *ante*.

[16] In *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 350–355 [276 Cal.Rptr. 326, 801 P.2d 1077], the Supreme Court declared unconstitutional the second paragraph of article I, section 24 of the California Constitution, which was added in 1990 by Proposition 115 and provided: "In criminal cases the rights of a defendant . . . to not suffer the imposition of cruel or unusual punishment, shall be construed by the courts of this state in a manner consistent with the Constitution of the United States. This Constitution shall not be construed by the courts to afford greater rights to criminal defendants than those afforded by the Constitution of the United States . . . ."

The scope of the California Constitution's prohibition of cruel or unusual punishment is not well-defined. Although that constitutional prohibition is most often cited when a defendant argues his or her sentence is unconstitutionally disproportionate, gross disproportionality of punishment apparently is not the only circumstance in which article I, section 17 of the California Constitution may be violated. (See, e.g., *In re Lynch* (1972) 8 Cal.3d 410, 420, 424 [105 Cal.Rptr. 217, 503 P.2d 921] [alluding to possibility that punishment may be unconstitutional in its *method*].) Nevertheless, the California Supreme Court has consistently followed the principle that "a sentence is cruel or unusual as applied to a particular defendant . . . [when] the punishment shocks the conscience and offends fundamental notions of human dignity [citation] . . . ." (*People v. Cox* (2003) 30 Cal.4th 916, 969–970 [135 Cal.Rptr.2d 272, 70 P.3d 277]; see also *People v. Lucero* (2000) 23 Cal.4th 692, 740 [97 Cal.Rptr.2d 871, 3 P.3d 248]; *People v. Hines* (1997) 15 Cal.4th 997, 1078 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Cox* (1991) 53 Cal.3d 618, 690 [280 Cal.Rptr. 692, 809 P.2d 351]; *People v. Frierson* (1979) 25 Cal.3d 142, 183 [158 Cal.Rptr. 281, 599 P.2d 587]; *In re Lynch, supra,* at p. 424.) In making that determination, "a reviewing court must examine the circumstances of the offense, including [the defendant's] motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities. [Citation.]" (*People v. Lucero, supra,* at p. 739.) In addition to those considerations of the nature of the offense and the offender, courts may also compare the punishment imposed for the offense with punishments imposed in the same jurisdiction for more serious offenses and with punishments imposed in other jurisdictions for the same offense. (*In re Lynch, supra,* at pp. 425–427.)

However, because the California Supreme Court typically has not discussed the two *Lynch* punishment comparison factors in deciding whether a defendant's punishment is unconstitutionally excessive under the California Constitution and such comparisons do not appear helpful in resolving that issue in this case, the focus is on the nature of the offense and the offender in discussing whether Kellogg's public intoxication conviction is cruel or unusual punishment under article I, section 17 of the California Constitution. (*People v. Cox, supra,* 30 Cal.4th at pp. 969–970; *People v. Lucero, supra,* 23 Cal.4th at p. 740; *People v. Smithey, supra,* 20 Cal.4th at pp. 1015–1016; *People v. Hines, supra,* 15 Cal.4th at p. 1078; *People v. Cox, supra,* 53 Cal.3d at p. 690; *People v. Dillon* (1983) 34 Cal.3d 441, 479, 482–489 [194 Cal.Rptr. 390, 668 P.2d 697].)

A section 647, subdivision (f) public intoxication offense, both in the abstract and as committed by Kellogg, is a nonviolent, fairly innocuous offense. It essentially involves the defendant being in a public place under the influence of alcohol and unable to exercise care for his or her own safety or

the safety of others or interfering with a public way. (§ 647, subd. (f).) The elements of a public intoxication offense, in the abstract, do not require violence or any harm to persons or property. It is a nonviolent offense, does not require a victim, and poses little, if any, danger to society in general. (Cf. *In re Lynch, supra,* 8 Cal.3d at pp. 425–426.) As committed by Kellogg, the offense was nonviolent, victimless, and posed no danger to society. Kellogg was found intoxicated sitting under a bush in a public area. He was rocking back and forth, talking to himself and gesturing. The record does not show that Kellogg's public intoxication posed a danger to other persons or society in general. His motive in drinking presumably was merely to fulfill his physical and psychological compulsion as an alcoholic to become intoxicated. Because Kellogg is involuntarily homeless and did not have the alternative of being intoxicated in private, he did not have any specific purpose or motive to be intoxicated in a *public* place. Rather, it was his only option.

Kellogg's nature and personal characteristics have been extensively discussed *ante*. Without repeating that discussion, the record shows Kellogg is involuntarily homeless and a chronic alcoholic with a past head injury who suffers from dementia, severe cognitive impairment, and a schizoid personality disorder.[17] As an involuntarily homeless person, Kellogg cannot avoid appearing in public. As a chronic alcoholic, he cannot stop drinking and being intoxicated. Therefore, Kellogg cannot avoid being intoxicated in a public place.

Based on the nature of the offense and the offender, Kellogg's section 647, subdivision (f) public intoxication conviction "shocks the conscience and offends fundamental notions of human dignity," and therefore constitutes cruel or unusual punishment in violation of article I, section 17 of the California Constitution. (*People v. Cox, supra,* 30 Cal.4th at p. 970; *People v. Lucero, supra,* 23 Cal.4th at p. 740; cf. *State ex rel. Harper v. Zegeer* (W.Va. 1982) 170 W.Va. 743 [296 S.E.2d 873, 875, 878] [holding conviction of chronic alcoholic for public intoxication constitutes cruel and unusual punishment in violation of West Virginia's Constitution].) Kellogg's conviction violates the Eighth Amendment of the United States Constitution and article I, section 17 of the California Constitution.

I would reverse the judgment.

Appellant's petition for review by the Supreme Court was denied September 22, 2004. George, C. J., did not participate therein. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.

---

[17] At the time of the instant offense, Kellogg was 44 years old. His extensive criminal history consists primarily of public intoxication offenses.